*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1076**

State of Minnesota,
Respondent,

vs.

Jorge Roman Vasquez,
Appellant.

**Filed May 31, 2016
Affirmed
Rodenberg, Judge**

Dakota County District Court
File No. 19HA-CR-14-2912

Lori Swanson, Attorney General, St. Paul, Minnesota; and

James C. Backstrom, Dakota County Attorney, Elizabeth Swank, Assistant County Attorney, Hastings, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Jennifer Workman Jesness, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Peterson, Presiding Judge; Bjorkman, Judge; and Rodenberg, Judge.

**U N P U B L I S H E D   O P I N I O N**

**RODENBERG**, Judge

On appeal from his convictions after a drive-by shooting, appellant Jorge Roman Vasquez argues that the district court reversibly erred by admitting the out-of-court

statements of the non-testifying victim to his friend and to a detective, as well as statements made by unknown declarants describing the incident. In his pro se brief, appellant also argues that there was insufficient credible evidence to support his convictions. We affirm.

**FACTS**

Between 9:00 a.m. and 2:00 p.m. on August 18, 2014, J.C.-L., who was then living in an apartment in West St. Paul, sat in his open one-stall garage socializing and drinking alcohol with some friends, including M.L. and M.E.-R. Around 2:00 p.m., a green car slowly drove past the garage and reversed course. The barrel of a gun was pointed out from the car. Shots were fired. J.C.-L. was shot in the upper right arm and in the lower right leg. M.E.-R. ran away from the garage while M.L. hid behind some garbage bags that blocked his view of the shooting. M.L. remained with J.C.-L., who indicated at first that "he was okay [and] that nothing happened to him."

A maintenance worker observed a car speeding away just after the shooting. He later identified it as a green Pontiac with a spoiler. The property manager also observed an older green car with a spoiler speed past her office window after she heard the gun shots. Two neighbors who lived nearby heard the gunshots from their third-floor balcony, and one of them observed a green, four-door Pontiac quickly leaving the area from where the gunshots seemed to have come.

The maintenance worker and the property manager ran to the garage to assist J.C.-L. The maintenance worker described J.C.-L. as "very calm . . . [and] very quiet" and stated that he "[did not] know if [J.C.-L.] was in shock or couldn't believe what just

2

happened or what [because] he just sat there." The property manager described J.C.-L. as "not upset," saying "I'm fine, I'm fine." J.C.-L. appeared to the property manager to be intoxicated.

Before paramedics arrived, J.C.-L. realized that he was bleeding and became "concerned," "scared," "real pale," and "alarmed." At that point, J.C.-L. told M.L. that the shooter was the husband of a woman with whom he had been in a relationship. J.C.-L. described the shooter as "sort of a light [complexioned] man . . . from Honduras." M.L. testified at trial that other unknown declarants described the car to him as a green Ford Taurus and the gun as a small, silver handgun.[1]

Inver Grove Heights Police Detective Justin Parranto assisted paramedics as a Spanish interpreter while J.C.-L. was transported to Regions Hospital in St. Paul. The detective asked J.C.-L. his name and date of birth. J.C.-L. gave his birth year as 1979, but gave an incorrect age. J.C.-L. appeared to Detective Parranto to be "very, very scared, frightened, very excited about everything that was going on . . . he thought he was going to die . . . was sweating . . . yelling at [the detective] . . . [and] just panicked." As the ambulance approached the hospital, J.C.-L. began repeatedly screaming that the person who shot him "lives over there," gesturing toward a nearby apartment. He pointed southwest toward the intersection of Lafayette and University, and asked the detective why he was at the hospital and not "going over there."

---

[1] Appellant objected several times to the prosecutor's elicitation of this testimony, and the district court sustained those objections. Later questions by the prosecutor concerning the statements of the unknown declarants were not objected to, and M.L. testified to what the unknown declarants said to him.

At the emergency room, J.C.-L. provided the name of the shooter's wife,[2] L.C., and stated that she lived in apartment number 10 near a McDonald's restaurant and a Metro Transit Station. J.C.-L. described the shooter as taller, darker, and skinnier than himself, and with short hair. J.C.-L. also stated that the shooter had been driving an older, green, four-door car. Detective Parranto testified at trial that he considered the situation to be an ongoing emergency because the victim had sustained multiple bullet wounds and the shooter had not been located.

As the detective was about to leave the hospital, J.C.-L. grabbed his arm and excitedly said the name "Jorge." Detective Parranto repeated the name, and J.C.-L. said "it was Jorge, his name is Jorge." The detective asked J.C.-L. if Jorge was the person who shot him, and J.C.-L. responded that "yes, Jorge. Jorge, the one that lives with [L.C.] in apartment 10."

Detective Parranto confirmed after follow-up investigation that L.C. lived in apartment number 10 in a building near a McDonald's restaurant and a Metro Transit station. The detective also confirmed that L.C. was associated with an individual named Jorge Vasquez, appellant herein.

West St. Paul police officers followed up on this information and located appellant at L.C.'s apartment. The officers handcuffed appellant and placed him in a squad car. The officers obtained a search warrant and found a handgun and a box of ammunition in L.C.'s closet. They also learned that appellant had a four-door, green Pontiac with a

_____

[2] As described below, the legal relationship between appellant and L.C. was apparently not one of husband and wife, but L.C. is referred to at several points in the record as appellant's wife.

4

spoiler, which was also searched pursuant to a warrant. Police found documents indicating that appellant had purchased the vehicle approximately one month earlier.

At the scene of the shooting, officers recovered six shell casings and five bullet fragments in or near the garage. No DNA evidence conclusively linked appellant to the shooting. A firearms examiner testified that bullets test-fired from the firearm located in L.C.'s apartment matched those found at the scene of the shooting.

L.C. testified that she had met J.C.-L. in 2010, that they had been in a romantic relationship for a few months, were no longer romantically involved, but remained friends. She testified that she had known appellant for six years and had an intermittent relationship with him. She stated that she and appellant were never legally married. Her children referred to appellant as "dad," and he stayed with her several nights per week.

Before trial, L.C. had told investigators that, when the police knocked on her door, appellant had confessed to shooting J.C.-L. She also told them that, within 30 days of the shooting, she and appellant had argued about her relationship with J.C.-L. At trial, she testified that both of these statements were lies caused by her anger toward appellant for involving police in her life.

Appellant was charged with attempted first- and second-degree murder, second-degree assault, and being a prohibited person in possession of a firearm. J.C.-L. had been removed from the country by the time the case came to trial. The state moved pretrial to admit J.C.-L.'s out-of-court statements to Detective Parranto and to M.L. as excited utterances. Appellant argued that the statements were not excited utterances and that admission of them at trial violated his constitutional right to confront the witnesses

5

against him. The district court ruled that the statements to Detective Parranto in the ambulance and at the hospital were admissible under the excited-utterance exception to the rule against hearsay, and were not testimonial. The court ruled that J.C.-L.'s statement to M.L. about the shooter's identity shortly after the shooting was also a non-testimonial excited utterance. The district court was not asked to make any pretrial ruling concerning the out-of-court statements of declarants other than J.C.-L. Appellant stipulated before trial that he is ineligible to possess a firearm.

The jury found appellant guilty of all charges. He was sentenced to 60 months on the prohibited-person-in-possession charge and 228 months for the attempted first-degree murder charge, concurrent with the prohibited-person-in-possession charge and consecutive to the unexpired term of appellant's prior and unrelated conviction. This appeal followed.

## D E C I S I O N

### I. J.C.-L.'s statements

Appellant first argues that the district court erred in admitting into evidence J.C.-L.'s statements to M.L. and Detective Parranto. "Evidentiary rulings rest within the sound discretion of the [district] court and will not be reversed absent a clear abuse of discretion. On appeal, the appellant has the burden of establishing that the [district] court abused its discretion and that appellant was thereby prejudiced." *State v. Amos*, 658 N.W.2d 201, 203 (Minn. 2003) (citation omitted).

Generally, hearsay evidence is inadmissible unless it qualifies under an exception provided in Minn. R. Evid. 803. *State v. Bauer*, 598 N.W.2d 352, 366 (Minn. 1999).

6

One exception allows for the admission of an "excited utterance." Minn. R. Evid. 803(2). "For a statement to be admitted under the excited utterance exception to the hearsay rule, there must have been a startling event or condition, the statement must relate to the event or condition, and the statement must be made under the stress caused by the event or condition." *State v. Gates*, 615 N.W.2d 331, 337 (Minn. 2000) *overruled on other grounds by Crawford v. Washington*, 541 U.S. 36, 1245 S. Ct. 1354 (2004). The excited-utterance exception to the general inadmissibility of hearsay finds its support in the belief that the excitement caused by an event eliminates the possibility of conscious fabrication, and insures the trustworthiness of the statement. *State v. Daniels*, 380 N.W.2d 777, 782 (Minn. 1986). It is within a district court's discretion to admit such evidence if the district court determines that "the declarant was sufficiently under the aura of excitement" when the statement was made to insure that it is trustworthy. *State v. Edwards*, 485 N.W.2d 911, 914 (Minn. 1992) (quotation omitted). In making this determination, a district court considers all relevant factors, including the length of time elapsed, the nature of the event, the physical condition of the declarant, and any motive to falsify. *Daniels*, 380 N.W.2d at 782-83.

### a. J.C.-L.'s statements to M.L.

Appellant argues that J.C.-L.'s statements to M.L. were not excited utterances because, when he described the shooter, J.C.-L. was not stressed or excited. Appellant

7

emphasizes that several witnesses described J.C.-L. as "very calm," "not upset," and saying "I'm fine, I'm fine," "this is nothing" and that "nothing happened."[3]

Although he was described by some as calm after he was shot, J.C.-L. was intoxicated and seems not to have immediately recognized that he had been shot. The maintenance worker testified that he "[did not] know if [J.C.-L.] was in shock or couldn't believe what just happened or what [because] he just sat there." When he realized that he had been wounded, J.C.-L. became "concerned," "scared," "real pale," and "alarmed." It was after this realization, and before medical help arrived, that J.C.-L. described the shooter to M.L. These statements to M.L. were made sufficiently close in time to the startling event as to be appropriate for admission as excited utterances. *See, e.g.*, *Daniels*, 380 N.W.2d at 782-84 (concluding that a statement made as long as an hour after the startling event may be considered an excited utterance); *State v. Berrisford*, 361 N.W.2d 846, 850 (Minn. 1985) (concluding that a statement made 90 minutes after a murder may be considered an excited utterance). The district court acted within its discretion in concluding that J.C.-L.'s statements to M.L. shortly after being shot were admissible under the excited-utterance exception.

### b. J.C.-L.'s statements to Detective Parranto

Appellant also argues that the district court erred by allowing Detective Parranto to testify to J.C.-L.'s out-of-court statements in the ambulance and at the hospital. Appellant argues that these statements were not excited utterances and were, in any event, testimonial.

---

[3] Appellant does not argue that J.C.-L.'s statements to M.L. were testimonial.

8

### i. Excited Utterance

Appellant argues that J.C.-L.'s statements to Detective Parranto were not excited utterances because they were too remote from the shooting in time and location. But there is record evidence indicating that Detective Parranto arrived on the scene within minutes of the shooting. The detective described J.C.-L. as "very, very scared, frightened, very excited about everything that was going on . . . he thought he was going to die . . . was sweating . . . yelling at [the detective] . . . [and] just panicked." J.C.-L. described the shooter in outbursts that occurred between answering the detective's questions about medical issues and saying he did not want to die. J.C.-L. only positively identified the shooter as "Jorge" at the emergency room when he spontaneously grabbed the detective's arm as the detective was about to leave.

In the ambulance, J.C.-L. said he was born in 1979, but misstated his age as 36 years old, rather than the 34 or 35 years old he was on that date. Appellant argues that this demonstrates that J.C.-L. was lying, which, in turn, establishes that he was not so excited that his out-of-court statements should be considered sufficiently trustworthy. Viewed in the light most favorable to the district court's ruling, J.C.-L.'s "lie" appears at least as likely to have arisen from the combination of J.C.-L's intoxication and his having been shot as from any fabrication on his part. *See Lossing v. Lossing*, 403 N.W.2d 688, 690 (Minn. App. 1987) (stating that in determining whether a finding is clearly erroneous, we review the record in the light most favorable to the district court's findings); *see also State v. Gomez*, 721 N.W.2d 871, 883 (Minn. 2006) (stating it is not the reviewing court's role to reconcile conflicting evidence). No motive appears for

J.C.-L. to mislead the detective about his age. The district court acted within its discretion when it concluded that J.C.-L.'s statements to Detective Parranto were excited utterances admissible under Minn. R. Evid. 803(2).

### ii. Confrontation Clause

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI; *see also* Minn. Const. art. I, § 6. The Confrontation Clause generally bars the admission of testimonial statements of a person who does not testify at trial. *Crawford*, 541 U.S. at 53-54, 124 S. Ct. at 1365-66). Even though it may be admissible under the evidentiary rules, the admission of a testimonial hearsay statement in a criminal trial violates the Confrontation Clause unless the person who made the statement is unavailable and the defendant has had a prior opportunity to cross-examine the declarant. *See id.* at 53-54, 124 S. Ct. at 1365. Nontestimonial hearsay statements are admissible in a criminal trial to the extent allowed under the rules of evidence. *See Davis v. Washington*, 547 U.S. 813, 825-26, 126 S. Ct. 2266, 2275-76 (2006). We review de novo whether the admission of an out-of-court statement of a person not present at trial violates the Confrontation Clause. *State v. Caulfield*, 722 N.W.2d 304, 308 (Minn. 2006).

Whether a statement is testimonial turns on the primary purpose of the interrogation or questioning. *Davis*, 547 U.S. at 822, 126 S. Ct. at 2273-74. If the primary purpose of the questioning is to enable police to meet an ongoing emergency, the

10

statements are nontestimonial. *Id.* If the purpose is to "establish or prove past events" to be used in a later criminal prosecution, the statements are testimonial. *Id.*

*Davis* identifies four factors to be considered in determining whether a hearsay statement was made to meet an ongoing emergency:

> (1) the [hearsay declarant] described events as they actually happened and not past events; (2) any "reasonable listener" would conclude that the [declarant] was facing an ongoing emergency; (3) the questions asked and answers given were necessary to resolve a present emergency, rather than only to learn what had happened in the past; and (4) there was a low level of formality in the interview because the [declarant's] answers were frantic and [the declarant's] environment was not tranquil or safe.

*State v. Warsame*, 735 N.W.2d 684, 690 (Minn. 2007) (citing *Davis*, 547 U.S. at 826-27, 126 S. Ct. at 2276-77). The Minnesota Supreme Court recognized in *State v. Brist* that courts are required "to conduct a separate Confrontation Clause analysis for out-of-court 'testimonial' statements, even when the statements at issue otherwise satisfy a firmly-rooted hearsay exception." 812 N.W.2d 51, 56 (Minn. 2012).[4]

Applying the *Davis* factors to this case, J.C.-L.'s statements to Detective Parranto in the ambulance were nontestimonial, and therefore admissible at trial. At the time, the detective was assisting paramedics by interpreting; his primary role was not gathering information for later use at trial. J.C.-L.'s statements were made shortly after he was shot. The shooter was still at large and no firearms had been recovered. At the time J.C.-L. made the statements, he was panicking, in pain, and fearful of dying. *See*

---

[4] The state's brief argues that the Confrontation Clause analysis properly considers whether the out-of-court statement falls within a firmly-rooted hearsay exception. This is no longer the case after *Crawford*. 541 U.S. at 53-54, 124 S. Ct. at 1365-66.

11

*Michigan v. Bryant*, 562 U.S. 344, 349, 131 S. Ct. 1142, 1050 (2011) (holding that statements made by a gunshot victim in response to informal police questioning about a shooting event when the victim appeared to be in great pain and spoke with difficulty were not testimonial). The questions asked by the detective were primarily designed to address J.C.-L.'s medical condition, and Detective Parranto appears to have asked about the shooter's identity only after J.C.-L. began pointing out the back of the ambulance and screaming that "he lives over there." The statements were also made in the non-tranquil environment of an ambulance that appeared to be getting closer to where J.C.-L. believed the shooter lived. *Cf. State v. Hull*, 788 N.W.2d 91, 93 (Minn. 2010) (holding that out-of-court statements identifying a suspect and made to "a police officer *investigating a theft*" are testimonial under *Crawford* (emphasis added)).

J.C.-L.'s statements in the emergency room are a closer call, occurring after the ambulance ride and after Detective Parranto asked about the shooter's identity based on J.C.-L.'s earlier statements. These statements at the hospital included a description of the shooter and the shooter's vehicle, that he had access to firearms, and that the shooter was associated with someone named L.C. who resided in an apartment numbered 10 near a McDonald's restaurant and a Metro Transit Station. This was an ongoing emergency in which Detective Parranto was not acting primarily as a crime investigator. When these statements were made, J.C.-L. was still in pain and panicking, the shooter had yet to be apprehended and apparently lived near the hospital where J.C.-L. was being treated, and, like the ambulance, the emergency room was not a "tranquil" environment. Additionally, J.C.-L.'s initial identification of the shooter as "Jorge" was made spontaneously as

12

Detective Parranto was about to leave the hospital, and it was not made in response to any questioning. Under *Davis*, J.C.-L.'s emergency-room statements were nontestimonial. 547 U.S. at 822, 126 S. Ct. at 2273-74. The district court did not err in allowing Detective Parranto to testify to J.C.-L.'s out-of-court statements over appellant's Confrontation Clause objections.

## II. Statements of unidentified declarants

Appellant argues that the district court erroneously permitted M.L. to testify about statements made by unidentified declarants concerning the shooter's vehicle and firearm. M.L. had no personal knowledge of those details. Appellant notes that four of the eight police officers who testified at trial repeated M.L.'s descriptions, which were in turn based on things he had heard from others.

Appellant objected to M.L.'s description of the car and firearm in his motion in limine and objected during M.L.'s testimony. The district court sustained appellant's objection as inadmissible hearsay and rejected the prosecutor's request to admit the statements as an excited utterance. But the prosecutor nevertheless continued to question M.L. about the statements of others. Although appellant did not specifically object to each of the prosecutor's questions, the district court had already definitively and correctly ruled that M.L.'s testimony concerning what unidentified others had said was not admissible because of the rule against hearsay. *See* Minn. R. Evid. 103(a) ("Once the court makes a *definitive* ruling on the record admitting . . . evidence, either at or before trial, a party need not renew an objection . . . to preserve a claim of error.") (emphasis

13

added).  Admission of the out-of-court statements of persons not identified or present at trial was error.

An evidentiary error that does not implicate a constitutional right[5] warrants a new trial if there is a "reasonable possibility" that the error "significantly affected the verdict." *State v. Matthews*, 800 N.W.2d 629, 633 (Minn. 2011) (quotations omitted).  Here, it is highly unlikely that the error in admitting these hearsay statements to M.L. significantly affected the verdict.  The property manager, a maintenance worker, two neighbors, and M.E.-R. all appeared at trial and testified about the shooter's vehicle.  M.E.-R. also testified that the firearm used was a small silver handgun.  This was first-hand and persuasive evidence concerning those issues.  The testimony of M.L. and of the officers concerning the out-of-court statements of unknown declarants was cumulative of these eyewitness accounts.  We see no reasonable possibility that the district court's admission of the unknown declarants' descriptions of the firearm and car had any significant effect on the jury's verdict.  The evidentiary error does not warrant a new trial.

### III.    Sufficiency of the evidence

Appellant argues that insufficient evidence supports his conviction because there was no conclusive DNA evidence linking him to the shooting and the victim did not testify at trial.  When reviewing the sufficiency of the evidence supporting a jury verdict, we are "limited to ascertaining whether, given the facts in the record and the legitimate inferences that can be drawn from those facts, a jury could reasonably conclude that the defendant was guilty of the offense charged." *Bernhardt v. State*, 684 N.W.2d 465, 476

---

[5] Appellant does not argue that these out-of-court statements were testimonial.

(Minn. 2004) (quotation omitted). We "will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that [the] defendant was proven guilty of the offense charged." *Id.* at 476-77 (quotation omitted).

It is not for us to second-guess the jury's credibility determinations. *State v. Moore*, 438 N.W.2d 101, 108 (Minn. 1989). The state's evidence, if believed, amply establishes the elements of each conviction. Appellant's sufficiency-of-the-evidence challenge therefore fails.

**Affirmed.**